**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 15-1446**

─────────────

JUSTIN D. THOMAS; IRENE S. THOMAS,

        Plaintiffs – Appellants,

    v.

CARMEUSE LIME & STONE, INCORPORATED; O-N MINERALS (CHEMSTONE) COMPANY,

        Defendants – Appellees,

    v.

THOMAS M. HELMS, SR.,

        Intervenor/Defendant – Appellee.

─────────────

**No. 15-1447**

─────────────

JUSTIN D. THOMAS; IRENE S. THOMAS,

        Plaintiffs,

    v.

CARMEUSE LIME & STONE, INCORPORATED; O-N MINERALS (CHEMSTONE) COMPANY,

        Defendants – Appellants,

    v.

THOMAS M. HELMS, SR.,

        Intervenor/Defendant – Appellee.

Appeals from the United States District Court for the Western District of Virginia, at Roanoke. Glen E. Conrad, Chief District Judge. (7:12-cv-00413-GEC)

---

Argued: January 27, 2016          Decided: March 30, 2016

---

Before DUNCAN and DIAZ, Circuit Judges, and Loretta C. BIGGS, United States District Judge for the Middle District of North Carolina, sitting by designation.

---

Vacated in part and affirmed in part by unpublished opinion. Judge Duncan wrote the opinion, in which Judge Diaz and Judge Biggs joined.

---

**ARGUED:** Jeffery Scott Sexton, Scott Andrew Stephenson, GENTRY LOCKE, Roanoke, Virginia, for Appellants. Robert Cameron Hagan, Jr., Fincastle, Virginia, for Intervenor/Appellee. Thomas Moore Lawson, LAWSON & SILEK, P.L.C., Winchester, Virginia, for Appellees/Cross-Appellants. **ON BRIEF:** Joshua E. Hummer, LAWSON & SILEK, P.L.C., Winchester, Virginia, for Appellees/Cross-Appellants.

---

Unpublished opinions are not binding precedent in this circuit.

DUNCAN, Circuit Judge:

This appeal involves a trilateral dispute over approximately 150 acres of limestone-rich land in Botetourt County, Virginia ("the Property"). Plaintiffs-Appellants Justin and Irene Thomas own the surface rights to the Property. Defendants-Appellees Carmeuse Lime & Stone, Inc. ("Carmeuse") and Thomas M. Helms share ownership of the Property's mineral estate.[1] The Thomases disagree with Carmeuse and Helms about the extent of their mineral rights and about the extent to which Carmeuse and Helms may disturb the Property's surface in order to extract the stone underneath. Carmeuse and Helms disagree with each other about what portion of the mineral estate each of them owns.

In ruling on the parties' cross-motions for summary judgment, the district court decided four specific issues that are before us on appeal. First, the district court declared unenforceable a restriction in an 1849 deed that purports to prohibit the owners of the Property's mineral estate from quarrying in the vicinity of a historic house and yard on the Property (the so-called "Yard Restriction"). Second, the

---

[1] Title to Carmeuse's portion of the mineral estate is actually held by Carmeuse's wholly owned subsidiary, O-N Minerals (Chemstone) Co., which is also a Defendant–Appellee. We use the term "Carmeuse" to refer collectively to both Carmeuse Lime & Stone, Inc. and O-N Minerals (Chemstone) Co., as well as Carmeuse's predecessor corporations.

district court held that Carmeuse and Helms are entitled to use modern quarrying techniques to extract minerals from the Property. Third, the district court held that the mineral estate owned by Carmeuse and Helms includes all of the stone on the Property, rejecting the Thomases' contention that Carmeuse and Helms own only a particular vein of limestone that runs through the Property's southwestern portion. Fourth, the district court determined how ownership of the Property's mineral estate is divided between Carmeuse and Helms.

For the reasons stated below, we vacate the district court's holding that the Yard Restriction is unenforceable, and affirm as to the remaining issues.

I.

The Thomases purchased the Property's surface estate in 2002. At the time, Carmeuse already owned and operated a limestone quarry across the road from the Property. In their pre-purchase investigation, the Thomases discovered that Carmeuse also owned some portion of the Property's mineral estate, but were told by Carmeuse that it had no immediate plans to do any quarrying on the Property.

An eighteenth-century stone house sits on the northwestern portion of the Property. The Thomases initially intended to renovate the house so that they could use it as their primary

4

residence. That plan never came to fruition, partly because the Thomases were unable to overcome opposition from Carmeuse to their efforts to have the property rezoned as residential, and partly because, in 2007, the family moved to North Carolina so that Justin Thomas could take a job there. Currently, the Thomases use the Property and the stone house for recreational purposes.

During the decade after the Thomases purchased the Property's surface estate, Carmeuse's plans for the Property evolved, and by 2012, Carmeuse had begun preparing to extract the limestone it owned on the Property. Upon learning of Carmeuse's intentions, the Thomases initiated this lawsuit, seeking several declaratory judgments to clarify the nature of Carmeuse's rights to the Property. Although the Thomases initially sued only Carmeuse, Helms intervened to protect his interest in the Property's mineral estate.

II.

The parties' disputes center on how to interpret deed language from three transactions in the history of the Property's ownership: (1) the initial severance of the Property's mineral estate from its surface estate in 1849, (2) the mineral estate's sale at public auction in 1901 and 1902, and (3) the conveyances of the mineral estate to its

5

current owners, Helms and Carmeuse, in 1992.  In this section, for each of those three transactions, we set out the specific language over which the parties disagree, explain the parties' disagreements, and discuss the district court's resolution of each.

A.

We discuss first the initial severance of the Property's mineral estate from its surface estate in 1849.  Before 1849, Greenville B.W. Reynolds owned both mineral and surface rights to a large, contiguous swath of land, of which the Property was a part.  In 1849, Reynolds granted to James S. Wilson full rights (surface and mineral) to much of that land.  But as to one 200-acre tract ("the Reynolds Tract"), Reynolds retained the surface estate for himself, conveying only the mineral estate to Wilson.  The 200-acre Reynolds Tract is essentially the same piece of land as the 150-acre Property; it simply includes an additional 50 acres for which the surface estate was split off at some point before the Thomases purchased the Property's surface estate in 2002.  Carmeuse and Helms are the present owners of the mineral estate underlying the entire Reynolds Tract.

The 1849 deed memorializing the Reynolds-Wilson transaction described the mineral estate conveyed to Wilson as containing "all the stone or rock of every kind, and particularly all

6

limestone, or quarries of limestone, or other kind of stone, in and upon every portion" of the Reynolds Tract. J.A. 244. So that Wilson could access that mineral estate, the 1849 deed further granted him "the privilege . . . of free ingress, egress, and regress, at all times, to enter and quarry, and take the [stone] away, or to construct kilns and burn the same into lime" on the Reynolds Tract. Id.

The 1849 deed qualified these broad mineral and access rights, however, through several other provisions meant to protect the interests of Reynolds and his heirs in the surface estate. One of those provisions was what the parties have referred to as the "Yard Restriction," which reads as follows:

> [I]t is also agreed and understood between the parties that the said Wilson, his heirs or assigns, is not to blast, or quarry, or take away, any stone within the enclosure of the yard attached to the said Reynolds' present dwelling house; this provision is inserted to protect the family of the said Reynolds, and of his heirs or assigns, or other persons who may be in the occupancy of the house, from annoyance.

J.A. 240. It is unclear whether the stone house that currently sits on the Property is the "dwelling house" referred to in the Yard Restriction. It is also unclear how large "the enclosure of the yard attached to" the house was in 1849.

The parties have presented two disputes associated with the 1849 severance deed. First, the parties disagree about the validity of the Yard Restriction. Carmeuse contends that the

7

Yard Restriction is invalid because it irreconcilably conflicts with the 1849 deed's grant of "all the stone or rock of every kind" underlying the Property, and because the Thomases' current inability to use the Property for residential purposes renders the Yard Restriction obsolete. The Thomases disagree, arguing that the Yard Restriction is valid and prohibits Carmeuse from quarrying in the vicinity of the stone house that currently sits on the Property. The district court agreed with Carmeuse, and declared that the Yard Restriction "is not a valid restriction applicable to the surface estate owned by [the Thomases] and against the mineral estate owners and that the owners of the stone and quarrying rights are not prohibited from disturbing the surface of [the Property], even including within the enclosure of the yard."[2] J.A. 1774.

Second, the parties disagree about the extent to which the 1849 deed limits what techniques Carmeuse and Helms may use to extract the minerals they own today. The Thomases contend that the parties to the 1849 deed would not have contemplated the destructiveness of modern limestone techniques, and that Carmeuse and Helms should therefore be barred from using them.

---

[2] Because the district court declared the Yard Restriction invalid, it did not address the parties' factual disputes concerning the size of the yard and whether the stone house currently on the Property is the "dwelling house" referred to in the Yard Restriction.

8

Carmeuse and Helms argue that the 1849 deed does not limit their use of modern quarrying techniques. The district court agreed with Carmeuse and Helms, and declared that they "may use modern quarrying techniques" to extract the minerals they own. J.A. 1775.

B.

We next explain the parties' dispute associated with the sale of the mineral estate underlying the Reynolds Tract at public auction in 1901 and 1902. After the death of James S. Wilson, the grantee in the 1849 deed, several of Wilson's heirs filed suit to have his estate sold and distributed. Thus, the Botetourt County Chancery Court divided Wilson's land holdings into two parcels and sold them by public auction. The mineral estate underlying the Reynolds Tract was split between the two parcels, each of which also contained full rights to portions of the adjacent land that Wilson had also owned. A single group of Wilson's heirs bought both parcels, but the parcels were conveyed in separate deeds.

The first parcel was conveyed to the group of heirs through a deed dated December 23, 1901. This 1901 deed described the mineral rights it conveyed as follows:

> the right to all the limestone on the land of the late G.B.W. Reynolds [i.e., the Reynolds Tract] . . . and along the vein of grey limestone, on said Reynolds lands extending in a South-Westerly direction, to a line three hundred feet from [the Reynolds Tract's

9

southwestern boundary]; together wi[th] all the rights of ingress, egress, and regress, and all the privileges and rights of quarrying, and using, and burning, and removing the stone on [the Reynolds Tract], accorded said John S. Wilson in [the 1849 deed].

J.A. 441–42. Thus, the 1901 deed conveyed mineral rights underlying the entire Reynolds Tract, except for a 300-foot strip along the tract's southwestern boundary.

The mineral rights to that 300-foot strip were included in the second parcel, which was conveyed through a deed dated July 26, 1902. That 1902 deed described the relevant mineral rights as follows:

all the stone on [the Reynolds Tract], from line of [the parcel conveyed through the 1901 deed], . . . thence South West to [the Reynolds Tract's southwestern boundary]; together with all rights of ingress, egress and regress to said lands, and all other rights and appurtenances, as to quarrying, and burning said stone, and all other rights as to said stone, and said land, . . . which rights, were conveyed to said John S. Wilson by G.B.W. Reynolds in [the 1849 deed].

J.A. 445.

The parties dispute precisely what mineral rights were conveyed through the 1901 and 1902 deeds. Because Helms and Carmeuse trace their titles to the 1901 and 1902 deeds, they can own no more today than was conveyed through those deeds. The Thomases contend that the deeds conveyed an interest only in "the vein of grey limestone" referred to in the 1901 deed, and that ownership of the remaining stone on the Reynolds Tract

10

therefore reverted to the surface-estate owners. Carmeuse and Helms, in contrast, contend that the 1901 and 1902 deeds conveyed an interest in all the stone underlying the Reynolds Tract, and that therefore they own all the stone underlying the Reynolds Tract today. The district court agreed with Carmeuse and Helms, and declared that "the 1901 and 1902 Deeds collectively conveyed the entirety of the mineral estate originally conveyed by the 1849 Deed, and that Carmeuse and Helms own all of the stone and quarrying rights granted by the 1849 Deed." J.A. 1775.

C.

We turn now to the 1992 conveyances of the mineral estate to its current owners. Sometime after 1902, Wilson's heirs had recombined the two parcels they had purchased at public auction and sold them to the Wilson Lime Company. See J.A. 1250–51. Wilson Lime Company held that property until 1992, when it conveyed part of it to Carmeuse and part of it to Helms.

Wilson Lime Company's conveyance to Carmeuse was memorialized in what the parties have referred to as the "1992 James River Deed." That deed conveyed full rights to a 316-acre tract that it described as being the same property that had been conveyed through the 1901 deed. J.A. 247-48. Additionally, in a separate provision, the deed conveyed

11

> all of the mineral rights including all rights and privileges necessary to quarry and remove the stone, on half the veins of limestone on [the Reynolds Tract] . . . said half to be measured along the veins of limestone from the [Reynolds Tract's northeastern boundary] in a southwesterly direction; said stone rights to include the use of any water rights [Wilson Lime Company] may have, or be entitled to in [the Property].

J.A. 248–49.

Wilson Lime Company's conveyance to Helms was memorialized in what the parties have referred to as the "1992 Helms Deed." The 1992 Helms Deed did not specifically mention any mineral estate in its description of the property conveyed; the description focused on the adjacent land for which the full estate was conveyed. The deed did, however, state that "[i]t is the purpose of this Deed to convey all of the property in this area owned by Wilson Lime Company, Inc., not previously conveyed by [the 1992 James River Deed]." J.A. 481. The parties agree that that statement of purpose was sufficient to convey to Helms whatever mineral rights underlying the Reynolds Tract Carmeuse did not already own.

These deeds are the source of the dispute between Helms and Carmeuse about how the mineral estate underlying the Property is divided between them. Carmeuse contends that, because the 1992 James River Deed refers to the 1901 deed, it conveyed the same mineral rights as were included in the 1901 deed; that is, mineral rights to the entire Reynolds Tract, except those

12

underlying a 300-foot strip along the southwestern property line, and that Helms owns mineral rights only to that 300-foot strip. Helms, in contrast, contends that the 1992 James River Deed's reference to "half the veins of limestone" on the Reynolds Tract means that the mineral rights underlying the Reynolds Tract are split evenly between he and Carmeuse. The district court agreed with Helms, declaring that "Carmeuse and Helms each own an equal one-half portion of the veins of limestone" on the Reynolds Tract, "with Carmeuse's half to begin at the northern boundary of [the Reynolds Tract], and measured along the veins of limestone in a southwesterly direction." J.A. 1775.

## III.

The Thomases appealed three of the district court's rulings, namely (1) that the 1849 deed's Yard Restriction is invalid, (2) that Carmeuse and Helms are entitled to use modern quarrying technology on the Property, and (3) that Carmeuse and Helms together own all of the stone underlying the Property, not just a particular vein of limestone. Carmeuse appealed the district court's ruling that Helms owns half of the mineral estate underlying the Reynolds Tract, not just a 300-foot strip along the tract's southwestern border.

13

This court reviews de novo a district court's disposition of motions for summary judgment. Calderon v. GEICO Gen. Ins. Co., 809 F.3d 111, 120 (4th Cir. 2015). "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Id. (quoting Fed. R. Civ. P. 56(a)). Because our jurisdiction rests in diversity, we apply Virginia substantive law. See, e.g., Liberty Univ., Inc. v. Citizens Ins. Co. of Am., 792 F.3d 520, 528 (4th Cir. 2015). Below, we address each of the four issues decided by the district court in turn.

A.

We address first the district court's declaration that the Yard Restriction does not bar Carmeuse from quarrying in the vicinity of the old stone house on the Property. The district court provided two justifications for that conclusion, both of which Carmeuse advances on appeal. First, the district court reasoned that the Yard Restriction was void under the doctrine of repugnancy because "the granting clause expresses that Wilson would own all the stone, which includes the stone within the enclosure of the yard, but the Yard Restriction suggests that he

14

could not quarry there."[3]  J.A. 1756.  Second, it reasoned that "even if the Yard Restriction was not void from the outset" under the doctrine of repugnancy, "it is no longer a valid, enforceable reservation" because "no one occupies or has occupied the house for some time."  J.A. 1757 (footnotes omitted).  We disagree with Carmeuse and the district court on both counts.

In interpreting a deed, we are to give effect "to every part of the instrument, if possible," and we are to interpret the deed's terms "to harmonize them, if possible, so as to give effect to the intent of the parties."  CNX Gas Co. LLC v. Rasnake, 752 S.E.2d 865, 868 (Va. 2014) (en banc).  Such harmonization, however, may not always be possible.  Thus, under the doctrine of repugnancy, "where there is an irreconcilable conflict between the granting clause and other parts of the deed, and it is impossible to discover with reasonable certainty the intention of the parties, . . . the granting clause prevails."  Goodson v. Capehart, 349 S.E.2d 130, 133 (Va. 1986).

Goodson provides an example of what Virginia courts consider to be an irreconcilable conflict between deed provisions.  In that case, the Supreme Court of Virginia

---

[3] Limestone can be accessed only by quarrying, and it is impossible to quarry without disturbing the surface. Thus, if one is unable to disturb the surface in a particular area, one is unable to access the limestone in that area.

15

considered a deed whose granting clause provided for a fee simple estate in the property at issue, but whose preamble said the grantee was receiving only a life estate. 349 S.E.2d at 131–32. Those two provisions could not both be true: the grantee could have received either a fee simple estate or a life estate, but not both. Because of this irreconcilable conflict, under the rule of repugnancy, the granting clause prevailed. Id. at 133–34.

Here, the statement in the 1849 deed's granting clause that Wilson would own "all the stone or rock of every kind" does not irreconcilably conflict with the Yard Restriction's prohibition on quarrying within the historic Reynolds dwelling house's yard. Unlike the provisions at issue in Goodson, the 1849 deed's granting clause and the Yard Restriction can both be true: it is a commonplace in property law for a person to hold formal title to property yet be unable to use some portion of it in his or her preferred manner, whether because of a deed restriction, government regulation, or some other reason. See, e.g., Yukon Pocahontas Coal Co. v. Ratliff, 24 S.E.2d 559, 563 (Va. 1943) (enforcing deed restrictions that prevented a mineral-estate owner from accessing certain parts of that estate). Thus, the Yard Restriction is not void under the doctrine of repugnancy.

Nor is the Yard Restriction void simply because the house on the Property is not currently being used as a residence. The

16

operative language of the Yard Restriction prohibits the mineral-estate owner from "blast[ing], quarry[ing], or tak[ing] away, any stone within the enclosure of the yard." J.A. 240. Nothing in that language suggests that the parties intended for the Yard Restriction's protections to be conditional upon the house being used as a residence.[4] Moreover, it makes little sense to suggest that temporary conditions such as the Property's current zoning or the Thomas's current need to live out of state for career-related reasons could permanently deprive them of the rights to which they were entitled when they purchased the Property's surface estate.

The district court suggested that its decision to permanently void the Yard Restriction based on the nature of the Thomases' current use of the Property was "buttressed by the case of Bradley v. Va. Ry. & Power Co., 87 S.E. 721 (Va. 1916)," J.A. 1758, and Carmeuse cites Bradley again on appeal. But Bradley is inapposite. That case involved a dispute between Virginia Railway & Power Company, which owned a 106-acre tract

---

[4] The 1849 deed does mention occupancy of the house when it justifies the Yard Restriction, explaining that it was "inserted to protect the family of the said Reynolds, and of his heirs or assigns, or other persons who may be in the occupancy of the house, from annoyance." J.A. 240. But even if this language were interpreted to affect the substantive scope of the Yard Restriction, it evinces an intent to protect the families of Reynolds's heirs and assigns regardless of whether they occupy the house; the only group for whom it requires occupancy are "other persons."

17

near Richmond, and Bradley, who claimed to own a fee-simple interest in a 1/4-acre lot within the Railway's larger tract, and sought to "erect a building on the lot for business purposes." 87 S.E. at 721. Bradley traced that purported fee-simple interest to an 1867 deed in which the grantor included a provision "reserving the family burying ground and also the servants' burying ground, each to contain one-eighth of an acre, with the right of free ingress and egress to and from the same." Id. The court held that this provision was not intended to retain fee-simple title to the 1/4-acre burial grounds such that Bradley could use that land for whatever purpose he wanted, but rather was intended "as a reservation of one-fourth of an acre for burial purposes and none other, for the use of the grantor's family." Id. at 723. Thus, Bradley had no right to use the 1/4-acre lot for his business purposes.

Bradley would help Carmeuse if it had held that the 1/4-acre lot could no longer even be used as a family graveyard. But that is not what the Bradley court did; it simply held that having the right to use that lot as a graveyard was not the same as having the right to use it to operate a business. Here, the Thomases do not seek to assert a new right outside the scope of the Yard Restriction; they seek only to enforce the protection the Yard Restriction has provided to the owners of the Property's surface estate since 1849.

18

The 1849 deed granted Wilson the full mineral estate underlying the Reynolds Tract, but the Yard Restriction prohibited the destruction of the portion of that tract on which Reynolds's dwelling house sat.  The Yard Restriction is not void under the doctrine of repugnancy, nor is it void because the Thomases do not currently use the house on the Property as their residence.  Thus, we vacate the district court's declaration that the Yard Restriction is invalid.[5]

B.

We address next the district court's declaration that Carmeuse and Helms are entitled to use modern quarrying techniques to access the mineral estate underlying the Property. The Thomases contend that the parties to the 1849 severance deed would not have contemplated that the mineral-estate owner would use such techniques, which the Thomases contend are more destructive to the surface than the quarrying techniques available in 1849 would have been.

Under Virginia law, the owner of a mineral estate "may occupy so much of the surface, adopt such machinery and modes of mining and establish such auxiliary appliances as are ordinarily

---

[5] It remains unclear whether the stone house that currently sits on the Property is actually the historic Reynolds dwelling house, and if it is, what area around the house is within the historic "yard."  But those are factual issues that the district court did not address at the summary judgment stage, and that we therefore do not address today.

19

used," and "is not limited . . . to such appliances as were in existence when the grant was made, but may keep pace with the progress of society and modern inventions." Oakwood Smokeless Coal Corp. v. Meadows, 34 S.E.2d 392, 395 (Va. 1945) (citation omitted). This common-sense authority to improve mineral-extraction operations as technology develops, however, "does not authorize enlargement of the estate granted" to a mineral-estate owner. Phipps v. Leftwich, 222 S.E.2d 536, 541 (Va. 1976). For example, in Phipps, the Supreme Court of Virginia held that the owner of the relevant property's mineral estate could not engage in surface mining of coal on the property because "the parties to the 1902 deed" that granted the mineral estate had "contemplated only underground mining of coal," which leaves the surface intact. Id. at 715.

The Thomases contend that Phipps controls this case--that just as the mineral-estate owner in that case was prohibited from engaging in surface mining when the parties had contemplated only underground mining, Carmeuse should be prohibited from engaging in modern quarrying on the Property because the parties to the 1849 deed contemplated only the sort of quarrying techniques practiced at that time. But Phipps involved a difference in kind between the rights granted to the mineral-estate owner (the right to develop underground coal mines), and the activity in which the mineral-estate owner

20

sought to engage (the right to surface-mine coal).  Here, there is no such difference in kind.  The 1849 deed granted the Property's mineral-estate owners the right to extract stone through quarrying, and that is exactly what the Property's mineral estate owners seek to do today.  And Virginia law is clear that they are entitled to employ modern technology to do so.[6]  Accordingly, we affirm the district court's declaration that Carmeuse and Helms are entitled to use modern quarrying techniques to extract the minerals they own.[7]

C.

We turn now to the district court's declaration that "the 1901 and 1902 Deeds collectively conveyed the entirety of the mineral estate originally conveyed by the 1849 Deed, and that Carmeuse and Helms own all of the stone and quarrying rights granted by the 1849 Deed."  J.A. 1775.  The Thomases contend that the 1901 and 1902 deeds actually conveyed only the vein of limestone running across the Property's southwestern portion, and that that is therefore all Carmeuse and Helms can own today.

---

[6] Notably, it is not even clear that modern quarrying techniques will be more disruptive than those available in 1849. Carmeuse presented evidence below suggesting that, although modern techniques involve a larger physical footprint, they also involve less environmental damage and fewer safety risks.  See J.A. 499–501.

[7] Of course, in doing so, Carmeuse and Helms will be bound by the terms of the 1849 deed, including the Yard Restriction.

21

Under Virginia law, "[w]here the language of a deed clearly and unambiguously expresses the intention of the parties, no rules of construction should be used to defeat that intention. Where, however, the language is obscure and doubtful, it is frequently helpful to consider the surrounding circumstances and probable motives of the parties." Rasnake, 752 S.E.2d at 867. Further, "[w]here language in a deed is ambiguous, the language must be construed against the grantor and in favor of the grantee." Id. In other words, "[a] grantor must be considered to have intended to convey all that the language he has employed is capable of passing to his grantee." Id.

The 1902 deed is straightforward. It expressly conveys "all the stone" on the portion of the Property to which it applies, not just the limestone. J.A. 445. Thus, we think it clear that, as to the 300-foot strip of the Property that was included in the 1902 Parcel, the mineral estate that exists today includes all stone, and not just limestone.

The 1901 deed is less clear, because it uses both the specific term "limestone" and the generic term "stone." J.A. 441–42. Nonetheless, we think it clear from the "surrounding circumstances and probable motives of the parties," Rasnake, 752 S.E.2d at 867, that the 1901 deed conveyed the entire mineral estate.

22

Wilson's property was being offered at a public auction because, after Wilson's heirs could not decide how to divide his property among themselves, several of them filed suit in Botetourt County's chancery court demanding that Wilson's property be sold and the proceeds distributed. Thus, as the district court pointed out, adopting the Thomases' proposed interpretation "would require the court to accept that the persons tasked with dividing the entirety of Wilson's property upon his death--including the special commissioners and the chancery court charged with overseeing and approving that process--actually conveyed less than all of that estate, in abrogation of their duties." J.A. 1764.

The documents associated with the chancery court's offering of Wilson's land provide no support for such an interpretation. In its announcement of the auction at which Wilson's property was sold, the chancery court described the property that would be conveyed in the 1901 deed as including "the stone rights" on the one portion of the Property, and described the property that would be conveyed in the 1902 deed as including "all the stone and mineral rights" on the other portion of the Property. J.A. 429. Moreover, to the extent any doubt remains, we are obligated to resolve that doubt in favor of the grantee. Rasnake, 752 S.E.2d at 867. Thus, we conclude that the 1901 and 1902 deeds together conveyed the entire mineral estate that

23

James S. Wilson had owned--that is to say, "all the stone" underlying the Property. Because Carmeuse and Helms trace their interests in the Property to those 1901 and 1902 deeds, we affirm the district court's declaration that they collectively own "all the stone" underlying the Property.

D.

Finally, we address the district court's division of the mineral estate underlying the Reynolds Tract between Carmeuse and Helms. The district court declared that "Carmeuse and Helms each own an equal one-half portion of the veins of limestone" on the Reynolds Tract, "with Carmeuse's half to begin at the northern boundary of [the Reynolds Tract], and measured along the veins of limestone in a southwesterly direction." J.A. 1775.

Carmeuse contends that it owns more than half of the mineral estate underlying the Reynolds Tract, despite the 1992 James River Deed's conveyance to it of only "half the veins of limestone" on the Reynolds Tract. J.A. 249. Specifically, it contends that it owns the same portion of the mineral estate underlying the entire tract, except for a 300-foot strip along the tract's southwestern border--that is, the portion of the mineral estate that was conveyed in the 1901 deed. For this proposition, it relies entirely on the 1992 James River Deed's statement that the 316-acre tract to which Carmeuse received

24

full rights (surface and mineral) was the same property that was conveyed in the 1901 deed. <u>See</u> J.A. 248.

Carmeuse's argument is not persuasive. When a deed's "language is explicit and the intention thereby is free from doubt, such intention is controlling." <u>Irby v. Roberts</u>, 504 S.E.2d 841, 843 (Va. 1998) (citation omitted). The 1992 James River Deed clearly stated that the mineral rights being granted were "on half the veins of limestone" on the Reynolds Tract, and specified how to determine the boundaries of that half. J.A. 249. The 1992 James River Deed's reference to the 1901 deed does not create any ambiguity. That reference comes in an entirely separate part of the deed from the portion that conveys mineral rights, making clear that it applies only to the property to which Carmeuse received full rights, not to the property to which it received solely mineral rights. The portion of the 1992 James River Deed that conveys mineral rights to Carmeuse makes clear that Carmeuse owns mineral rights associated with "half the veins of limestone" on the Reynolds Tract. Thus, we affirm the district court's holding that ownership of the Property's mineral estate is evenly split between Carmeuse and Helms.

25

IV.

For the reasons stated above, we vacate the district court's holding that the Yard Restriction is unenforceable, and affirm as to the remaining issues.

<u>VACATED IN PART AND AFFIRMED IN PART</u>